# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00400-CV

**James Tex Steeg, Appellant**

**v.**

**Baskin Family Camps, Inc., d/b/a Balcones Springs Executive Retreat &
Conference Center, Appellee**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
## NO. 20152, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

## O P I N I O N

James Tex Steeg appeals from the take-nothing summary judgment rendered against him on his claims that he was injured by the negligent acts and omissions of Baskin Family Camps, Inc., doing business as Balcones Springs Executive Retreat & Conference Center. He sues for damages he claims resulted from his fall from a horse during a trail ride at appellee's facility. The district court granted appellee's motion for summary judgment based on its immunity from damages for personal injuries suffered by a participant in an equine activity under the Liability for Equine Activity Act ("the Act"). *See* Tex. Civ. Prac. & Rem. Code Ann. § 87.003 (West Supp. 2003). On appeal, Steeg contends that appellee's actions either did not fall within the scope of the limitation

of liability or fell within an exception to the limitation. He also contends that the Act violates the open courts guarantee of the state constitution. *See* Tex. Const. art. I, § 13. We will reverse the judgment and remand for further proceedings.

## FACTUAL BACKGROUND

The following factual summary is taken from evidence submitted in the summary-judgment proceedings. It includes some evidence that favors the judgment and therefore cannot be considered under our standard of review. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999) ("When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant."). This evidence is included in order to present a context for the proceedings in the trial court. This factual summary should not be taken as a conclusive finding of any fact.

Steeg, then fifty-three years old, attended a corporate retreat with other members of the real-estate sales agency of which he was president. He participated in a trail ride guided by appellee's employee, Camden Fisher. Fisher was hired as a food server, had not led a ride at appellee's facility, had not received appellee's written trail ride policies, and was not asked about her qualifications when she was asked to lead the ride. But, she had ridden horses her whole life, ridden horses at auctions, and been a scout on a week-long trail ride. She intended to become a wrangler when appellee had a position available. Fisher had also ridden the horses used on this ride along the same trail.

Fisher saddled the horses for the ride using Australian stock saddles. Although she preferred Western saddles and did not use the Australian stock saddles when riding the horses in

2

preparation for the ride, Fisher said she was familiar with the Australian stock saddles.[1]  Fisher testified that she saddled all the horses without supervision and regirted Steeg's horse—Rose, a horse used for children—after the horse released stomach air.

Before the ride, the riders signed release waiver forms releasing appellee from liability.  Although Fisher did not at that time ask about their riding experience, at some point before they departed Fisher asked Steeg whether he had ridden a horse before.  He said he had ridden fifteen years earlier and that he knew how to ride.

Fisher rode last in the line of five horses.  Rebecca Freeman, a participant, rode at the front.  Where the trail opened up, Freeman ran her horse ahead and then returned to the group; some witnesses recalled that Steeg accompanied her; testimony varied as to whether Freeman ran her horse one, two, or three times.  Fisher permitted these departures, but requested that the riders wait until the trail opened up and that they remain within her sight; neither Steeg nor Freeman remembered this latter restriction.  There is also some dispute regarding when Freeman obtained permission to ride ahead, and if that permission included Steeg explicitly or implicitly.  Fisher testified that, when the riders paused at the midway point, she rechecked all of their horses to make sure the equipment was in place.

When Freeman ran her horse for the final time, Steeg's horse followed; it is disputed whether Steeg prompted the horse or it ran after Freeman's horse of its own accord.  Steeg said he

---

[1]  Steeg notes that Fisher referred to the Australian stock saddles as an "English saddle" or "English style saddle."  Appellee responds that the English and Australian saddles are similar.

tried to get his horse to stop and yelled for Freeman to stop. Freeman's horse stopped abruptly, as did Steeg's horse. Steeg fell off the horse sideways onto his upper left chest. His chest hurt and he felt winded. His saddle had slipped ninety degrees to the side. Freeman recalled that Steeg said his saddle slipped when the horse ran, but could not remember for certain whether he said that before or after he fell; she believed that he yelled it as the horses were running. When Fisher and the other riders caught up to the pair, she moved Steeg's saddle back on top of the horse. Steeg said that Fisher tightened the girth; Fisher did not recall doing so. Steeg testified that he did not believe that the saddle was defective, but that it had been cinched too loosely onto the horse.

Shortly after the ride, Steeg participated in a teambuilding exercise on ziplines—an exercise in which each person was strapped into a climbing harness suspended from a cable, climbed up a telephone pole, and slid down the cable over a lake and into a sandpit landing area six hundred feet away. Although it was painful to climb the pole, Steeg participated. He attended the evening social activities and stayed the night.

Almost a day after the fall, when colleagues told him he literally looked green, Steeg went to the hospital. While at the hospital, he was sweaty and losing consciousness—symptoms of shock from blood loss. Doctors discovered that he had a ruptured spleen that had to be removed. Sometime during or after the splenectomy, he suffered a stroke. Thereafter, his vision was impaired. The impairment was attributed to the stroke triggered by the surgery and blood loss from the spleen ruptured by the fall.

**PROCEDURAL HISTORY**

Steeg sued appellee, alleging that several negligent acts and omissions led to his injuries and consequent damages. He contended that appellee failed to have enough trained staff to

4

conduct the trail ride, failed to properly train Fisher how to conduct a safe trail ride, and failed to properly train Fisher on the characteristics and use of the Australian stock saddle. He complained that Fisher failed to properly supervise and control the riders, including Steeg himself, by allowing them to run their horses, by failing to properly enforce her own instructions, and by failing to properly inspect and secure his saddle. He requested $1,875,000 in damages—the sum of $31,471.31 in past medical expenses, up to $345,106.40 in lost income (up to $38,776 annually lost for 8.9 years of work-life expectancy), and past and future pain, physical impairment, and mental anguish—approximately $1.5 million.

Appellee moved for summary judgment on several grounds. Appellee contended that it was exempt from liability under the Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 87.003. Appellee asserted that the Act applied because Steeg's injuries were caused by one or more of the following: the propensity of an equine animal to behave in ways that may result in injury, the unpredictability of an equine animal's reaction to sudden movement by another animal, and a participant's negligent actions. Appellee also contended that Steeg released appellee from liability by signing the release waiver form. Appellee finally contended that Steeg presented no evidence to support his claims that its acts and omissions proximately caused his injuries—especially his vision impairment.

Steeg responded that neither the Act's immunity nor the release waiver excused appellee from liability for his damages. Steeg argued that negligence in supervision, saddling of the horse, and conduct of the ride are not inherent risks of equine activity.

5

The district court concluded that appellee was not liable for damages because the injury was within the scope of the Act's liability immunity and not within its exceptions. The court held that a slipping saddle is an inherent risk of an equine activity. The court held further that an improperly cinched girth strap is not faulty equipment under the statute. The court also held that neither the training and supervision of the wrangler nor the wrangler's allowing ride participants to trot or run their horses constituted wilful and wanton disregard of the safety of the riders. Based on these findings, the court concluded that the Act barred appellee's liability for Steeg's injuries. The court denied the motion based on Steeg's signing of the release waiver, and declined to reach the no-evidence basis for the motion. The court granted summary judgment that Steeg take nothing by his claims.

## DISCUSSION

Steeg raises several issues on appeal, but we will reach only the first. He argues that the basis for immunity from liability—the inherent risk of equine activity—does not include the risk that equine professionals and sponsors will be negligent and thereby injure participants. Our resolution of this appeal is guided by the standard of review for summary judgments, the terms of the Act, and the facts of this case as presented in the summary-judgment record.

**The standard of review**

Summary judgment is properly granted only when the movant establishes there are no genuine issues of material fact to be decided and he is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991); *Memorial*

6

*Med. Ctr. v. Howard*, 975 S.W.2d 691, 692 (Tex. App.—Austin 1998, pet. denied).  A defendant seeking summary judgment must negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter of law each element of an affirmative defense.  *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).  If the defendant establishes his right to summary judgment, the plaintiff must then present evidence raising a fact issue.  *See id*.  In reviewing the grant of summary judgment, we view the evidence in the light most favorable to the non-movant and make every reasonable inference and resolve all doubts in favor of the non-movant.  *See id*.; *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

**The Act**

In the Act, the legislature specified certain situations in which persons involved in equine activities are not liable for damages resulting from dangers or conditions that are an inherent risk of that activity.  There is no dispute on appeal that appellee is an equine activity sponsor and that Steeg was involved in an equine activity.  Sponsors of such activities are immune from liability as set out in the statute:

> Except as provided by Section 87.004, any person, including an equine activity sponsor . . . is not liable for property damage or damages arising from the personal injury or death of a participant in an equine activity or livestock show if the property damage, injury, or death results from the dangers or conditions that are an inherent risk of an equine activity . . . including:
>
> (1)  the propensity of an equine or livestock animal to behave in ways that may result in personal injury or death to a person on or around it;
>
> (2)  the unpredictability of an equine or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal;

(3)  with respect to equine activities, certain land conditions and hazards, including surface and subsurface conditions;

(4)  a collision with another animal or an object; or

(5)  the potential of a participant to act in a negligent manner that may contribute to injury to the participant or another, including failing to maintain control over the equine or livestock animal or not acting within the participant's ability.

Tex. Civ. Prac. & Rem. Code Ann. § 87.003.

There are some exceptions to this immunity:

A person, including an equine activity sponsor [or] equine professional . . . is liable for property damage or damages arising from the personal injury or death caused by a participant in an equine activity or livestock show if:

(1)  the injury or death was caused by faulty equipment or tack used in the equine activity or livestock show, the person provided the equipment or tack, and the person knew or should have known that the equipment or tack was faulty;

(2)  the person provided the equine or livestock animal and the person did not make a reasonable and prudent effort to determine the ability of the participant to engage safely in the equine activity or livestock show and determine the ability of the participant to safely manage the equine or livestock animal, taking into account the participant's representations of ability;

(3)  the injury or death was caused by a dangerous latent condition of land for which warning signs, written notices, or verbal warnings were not conspicuously posted or provided to the participant, and the land was owned, leased, or otherwise under the control of the person at the time of the injury or death and the person knew of the dangerous latent condition;

(4)  the person committed an act or omission with wilful or wanton disregard for the safety of the participant and that act or omission caused the injury;

(5)  the person intentionally caused the property damage, injury, or death; . . . .

*Id*. § 87.004 (West Supp. 2003). The remaining exception to the immunity involves livestock shows. *See id*.

The Act thus shields sponsors from liability for factors beyond their control, such as innate equine behavior, unknown land conditions, negligence by participants, and interactions of these factors. The Act denies immunity from liability for factors essentially within the sponsors' control, such as tack in poor condition, the inappropriate matching of participant and horse, the known dangers of sponsors' land, and their own wilful or intentional actions. The Act essentially sets two benchmarks on the continuum of factors causing injuries and damage: (1) factors that are inherent risks of equine activity and never result in liability; and (2) other factors listed in the Act that are excepted from immunity. These benchmarks do not exhaust the potential causes of injury, however; between them lie other factors that may result in the sponsor's liability for damages.

Appellee argues that interpreting the Act to permit sponsor liability for negligence improperly grafts onto the Act a preliminary showing of non-negligence for equine activity sponsors to gain the protections of the Act. But considering whether Steeg's injuries resulted from the sponsor's negligence is not a pretest. Rather, it is part of the inquiry into whether the injury resulted from an inherent risk of equine activities. The facts of each case will reveal whether the cause of the damage is one for which the sponsor is immune from liability. *See Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1103-05 (10th Cir. 2002).

Appellee further argues that the absence of negligence among the causes of injury excepted from the immunity in section 87.004 means that sponsor negligence must be included in the list of causes of damage for which sponsors are immune from liability. *See* Tex. Civ. Prac. &

9

Rem. Code Ann. § 87.004. But sponsor negligence is not expressly listed as an inherent risk of equine activity nor is it mentioned as an exception to immunity. *See id*. § 87.003. We conclude that the absence of negligence from the list of exceptions means only that sponsor negligence is not excepted from immunity.

Whether immunity applies depends upon the interpretation of the phrase "results from the dangers or conditions that are an inherent risk of an equine activity." Appellee propounds a restrictive interpretation of the phrase, arguing essentially that, because a horse may run and stop unexpectedly and a rider may fall, such falls are inherent risks for which sponsors are immune from liability. However, the Act confers immunity from liability for injury resulting, not from specific occurrences such as falls, but from more general dangers or conditions like unpredictable behavior of animals or other participants. *See id*. Because the Act does not confer immunity for injuries resulting from a fall or other occurrence caused by something other than an inherent risk, courts must consider the full array of underlying causes for the horse running and the person falling that are evident in the record. Courts must examine whether the injury results from innate equine behavior, the actions of participants, or some other cause, such as sponsor negligence. Given the wide array of possible causes of injuries, determining whether injuries result from an inherent risk of equine behavior or from some other cause requires a fact-intensive inquiry into the circumstances leading to the injury. *See Sapone*, 308 F.3d at 1103-05.

**Application**

We must now determine whether appellee established that no genuine issue of material fact exists regarding whether Steeg's injury resulted from an inherent risk of equine activity and that appellee was entitled to judgment as a matter of law. *See Lear Siegler*, 819 S.W.2d at 471.

10

In holding that appellee is immune from liability for damages, the district court concluded that a slipping saddle is an inherent risk of an equine activity. A saddle may slip for many reasons, several of which arise from inherent risks of equine activity—horses sweat, saddles stretch, saddle pads compress, riders sit off-center. *See Cooperman v. David*, 214 F.3d 1162, 1168-69 (10th Cir. 2000); *see also Sapone*, 308 F.3d at 1103-05. But a saddle may slip for reasons that are not inherent risks, such as negligent cinching. *See Cooperman*, 214 F.3d at 1168-69.[2] Sponsors are not immune from all damages resulting from slipping saddles, just from those due to injuries resulting from inherent risks of equine activity. *See id.* The district court thus erred by concluding as a matter of law that all slipping saddles are an inherent risk of equine activity, and thus holding appellee immune from liability.

A similar analysis preserves Steeg's complaints that appellee's conduct of the ride created the conditions that caused him to be thrown from the horse. Although injuries suffered after falling from a horse that runs and stops suddenly *may* result from inherent risks of equine activity, like innate horse behavior or goading by participants, Steeg contends that his injuries resulted from appellee's negligent acts and omissions. Sponsors are not immune if they fail to fulfill a common-law duty to protect participants. *See Sapone,* 308 F.3d at 1104 (although bolting horses are inherent risk of equine activity, child's injuries suffered in fall from bolting horse might be caused by non-inherent risk factors such as inadequate pre-ride instructions, taking a too-difficult path, and not

---

[2] Although the Tenth Circuit concluded that the plaintiff had not presented sufficient evidence to show that the saddle slipped for reasons that are not inherent risks of equine activity, the court cited a case in which a court held that a rider did not assume the risk that his saddle would be improperly cinched. *Cooperman v. David*, 214 F.3d 1162, 1167 n.5 (10th Cir. 2000) (citing *Liossis v. Cavalry Riding Academy Co.*, 87 N.E.2d 266, 268 (Ohio 1949)).

11

providing a helmet). The district court's conclusion that appellee was not grossly negligent does not, without more, support the summary judgment. Whether Steeg's injuries and damages were caused by an inherent risk of equine activity is a fact-intensive inquiry that cannot be disposed of on summary judgment on this record.

Appellee correctly notes that a great deal of evidence in the record supports the judgment. There is evidence that Fisher properly saddled the horse and rechecked it before and during the ride, that the saddle stayed in place until the fall, that Freeman persuaded Fisher to allow her and Steeg to ride ahead, and that either Freeman convinced Steeg to follow or that Steeg's horse followed on its own. This evidence supports the conclusion that Steeg's fall and injury resulted from one or more of the enumerated dangers or conditions for which sponsors are immune from liability, such as innate equine behavior and participant negligence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 87.003(1), (2), (5).

But the fact that some evidence favors immunity cannot be grounds for summary judgment when other evidence weighs against immunity. The standard of review requires that we make every reasonable inference and resolve all doubts in favor of the non-movant. *See Nixon*, 690 S.W.2d at 548-49. As a result, summary judgment is usually not appropriate when the issues are inherently those for a factfinder, as in cases involving intent, reliance, reasonable care, uncertainty and the like. *See Wofford v. Blomquist*, 865 S.W.2d 612, 614 (Tex. App.—Corpus Christi 1993, writ denied); *Hilton v. Texas Inv. Bank, N.A.*, 650 S.W.2d 545, 547 (Tex. App.—Houston [14th Dist.] 1983, no pet.).

Some evidence supports the claim that appellee's negligent acts or omissions contributed to Steeg's fall. There is evidence that Fisher may not have saddled the horse properly: Freeman testified that Steeg complained that the saddle was slipping before he fell off the horse, and there is evidence that the saddle slipped ninety degrees to the left when Steeg fell. There is also evidence that Fisher chose to ride behind the participants and permitted them to run their horses. By affidavit, Jan Dawson, president of the American Association for Horsemanship Safety, Inc., opined that the deposition testimony indicates that Fisher did not properly secure the saddle and did not adequately monitor its security during the ride. Whether any slippage was due to risks inherent in equine activity or because of negligent saddling is a fact question not conclusively resolved by the summary-judgment evidence. *See Wofford*, 865 S.W.2d at 614 (reasonable care normally fact issue). Dawson also opined that appellee conducted the ride negligently by allowing Fisher to lead the ride without sufficient training and sending her out as the only wrangler. Dawson also opined that Fisher's decision to ride at the back of the line and permit the riders to gallop away and out of sight constituted negligence. Dawson stated that these negligent actions proximately caused Steeg's fall. This evidence reveals the existence of genuine issues of material fact preventing summary judgment.

Because appellee has not shown as a matter of law that it is immune from liability, we need not review Steeg's challenges to the court's rejection of the immunity exceptions and to the constitutionality of the Act. *See* Tex. R. App. P. 47.1 (court must address issues necessary to final disposition of appeal). The exceptions to the immunity are relevant only if the immunity applies. Our reversal of the judgment that the immunity applies renders appellate consideration of the

13

exceptions unnecessary. For similar reasons, we need not consider Steeg's contention that the Act is unconstitutional.

## CONCLUSION

We reverse the summary judgment and remand the cause for further proceedings. A genuine issue of material fact exists regarding whether Steeg's injuries resulted from an inherent risk of equine activity. Because the record does not conclusively demonstrate that the acts and omissions Steeg alleges are inherent risks of equine activity, the court erred by rendering summary judgment that appellee is immune from liability for his injuries. This opinion should not be construed as deciding conclusively any fact dispute such as whether Steeg's injuries resulted from a danger or condition that is an inherent risk of equine activity. We conclude only that appellee did not show, on this record, that it is entitled to immunity and judgment as a matter of law.

_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Reversed and Remanded

Filed: July 24, 2003

14